CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 15-1609

DAVID NOVOSELSKY,

*Plaintiff-Appellee,*

*v.*

DOROTHY BROWN, in her individual
capacity, and COOK COUNTY, a Body
Politic,

*Defendants-Appellants.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CV 03702 — **Charles R. Norgle**, *Judge.*

————————————

ARGUED OCTOBER 1, 2015 — DECIDED MAY 10, 2016

————————————

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The parties in this action have a
long and litigious relationship. Over the past decade, plaintiff
David Novoselsky has filed many lawsuits alleging improprie-
ties by defendant Dorothy Brown in her capacity as Clerk of
the Circuit Court of Cook County, Illinois. Brown later made

statements to the public and to private parties accusing Novoselsky of being an unscrupulous attorney. Those statements form the basis of this case.

Novoselsky brought this suit against Brown under state law for defamation and under 42 U.S.C. § 1983 for First Amendment retaliation, and he seeks to hold Cook County liable for Brown's actions pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Brown moved for summary judgment based on arguments that her communications are protected from liability by a web of immunity defenses. The district court denied defendants' motion for summary judgment, and defendants have taken this interlocutory appeal from the rejection of the immunity defenses.

We reverse. On the state-law defamation claim, Brown's communications were all statements reasonably related to her official duties. Illinois state law provides immunity to Brown for claims based on these statements. Brown is also entitled to summary judgment on the First Amendment retaliation claim, for all she did to retaliate was criticize Novoselsky. It follows that Cook County is also entitled to summary judgment.

I.  *Factual and Procedural Background*

   A.  *Communications by Brown*

At relevant times, defendant Dorothy Brown has been the Clerk of the Circuit Court of Cook County, Illinois. Plaintiff David Novoselsky is a Wisconsin citizen with a law practice in Chicago. Since 2004, Novoselsky has served as attorney in over a dozen lawsuits brought by various plaintiffs against Brown and Cook County. These lawsuits repeatedly raised allegations that Brown was misappropriating county filing fees.

In particular, Novoselsky alleged that between 2001 and 2011, the Cook County Clerk's office did not report a shortfall of receipts totaling upwards of $300 million. None of Novoselsky's lawsuits have resulted in favorable judgments for his clients.

On June 14, 2010, Brown filed a complaint with the Illinois Attorney Registration and Disciplinary Committee ("ARDC"). Her complaint said that Novoselsky had breached a number of provisions of the Illinois Supreme Court Rules of Professional Conduct, including: Rule 3.1, filing meritless claims; Rule 3.6, making extrajudicial statements to the public; Rule 4.1, making false statements; and Rule 8.4, committing general misconduct. Brown's office also issued a press release that summarized the contents of the complaint. The release said that Novoselsky was "guilty of misconduct," had "wasted taxpayer money," and had engaged in conduct that was "clearly not professional."

Novoselsky counters that the ARDC complaint amounted to retaliation for his behavior at a January 2010 press conference held by Brown. In the midst of a campaign for the Democratic nomination for Cook County President, Brown had been criticized for her handling of her office's "Jeans Day" program. The program gave employees the opportunity to pay a small sum for the privilege of wearing jeans to work on designated days. The funds were collected and used to aid employees in times of misfortune, to provide donations to charities, and to fund office parties. Questions arose as to both recordkeeping and the propriety of Brown soliciting donations from public employees. Brown called the press conference to address these accusations.

After reading a prepared statement, Brown invited questions. Believing Novoselsky was a member of the press, Brown engaged him in discussion. She found his questions, which implied that she had engaged in criminal conduct, "unprofessional and disrespectful." Brown later expressed concern that the public would accept as true Novoselsky's repeated false accusations at the press conference and in litigation. In any event, Brown lost the primary election in March 2010. Brown's office completed a first draft of the ARDC complaint in April and filed the complaint in June. The filed complaint accused Novoselsky of fraudulently representing himself as a member of a legitimate news organization to gain entry to the press conference, as well as of making numerous disparaging allegations and filing multiple meritless lawsuits against Brown.

The ARDC complaint did not end Novoselsky's litigation efforts. After Brown filed the complaint, Novoselsky took part in a lawsuit seeking to force the funding and implementation of a previously approved juvenile intervention program. The program was designed to reassign non-violent juvenile offenders from the criminal justice system to social services supervision, sparing them from incarceration alongside more serious offenders. Leaders of the lawsuit said that Brown had refused to release funds because she had determined that the program violated the Illinois Constitution. Novoselsky took the case, working alongside a former state court judge who had resigned from the bench specifically to pursue the lawsuit. Civil rights leader Reverend Jesse Jackson, Sr. agreed to serve as named plaintiff. The suit was filed on May 19, 2011.

On May 20 and 21, Brown reached out to Reverend Jackson to discuss the case. Brown also forwarded two documents

to Reverend Jackson. The first was a detailed assessment of the merits of the case by the Office of the Clerk in which Brown denied that she was delaying implementation of the juvenile intervention program and claimed that Novoselsky had instigated the lawsuit in order to "turn the public trust against the first African-American Clerk of the Circuit Court of Cook County." The second was an annotated index of Novoselsky's previous litigation efforts against Brown. These communications had an effect on Reverend Jackson. He appeared with Brown on the afternoon of May 21 on a local Chicago television station to discuss their efforts to cooperate on the program moving forward. He also withdrew his name from the lawsuit against Brown.

In response to both Brown's communications with Reverend Jackson and her pursuit of the ARDC complaint and press release, Novoselsky filed this lawsuit on June 1, 2011, presenting a state-law claim of defamation and a § 1983 claim of First Amendment retaliation. Less than a week after Novoselsky filed this suit, Brown sent a long letter to an investigator for a private watchdog group, the Better Government Association ("BGA"). The letter spelled out again the lawsuits Novoselsky had filed against Brown, his behavior at the Jeans Day press conference, and his potential "racial animus against Clerk Brown" feeding into the "unconscious perception some people may have that African-Americans are intellectually and morally inferior." For good measure, Brown included quotations from Lewis Carroll and various psychologists. Brown followed this up in November with a letter to the Cook County President and Board of Commissioners. The letter repeated Brown's characterizations of Novoselsky's litigiousness. It also accused an unknown county official of leaking an internal memorandum to Novoselsky. Brown argued that this

memorandum, suggesting that the County should sever its present banking relationship with low-rated financial institutions, was fueling Novoselsky's accusation that Brown was irresponsibly depositing County funds in high-risk banks.

In March 2012, Novoselsky filed a second amended complaint, which is now the operative complaint for this case and this appeal. His claims of a First Amendment violation and of defamation remained the same, but he added allegations regarding Brown's communications to the BGA and the Board of Commissioners. Novoselsky now bases his suit on four communications: (1) Brown's ARDC complaint and press release; (2) Brown's communications to Reverend Jackson; (3) the letter to the BGA; and (4), the letter to the Cook County President and Board of Commissioners.

### B.  *Procedural History*

In September 2013, Novoselsky filed a motion for partial summary judgment, arguing that there were no issues of fact regarding the communications with Reverend Jackson, the letter to the BGA, and the letter to the Board of Commissioners. In September 2014, the district court denied the motion. In the interim, Brown and Cook County filed their own motion for summary judgment. Brown argued that she was protected by both absolute and qualified immunities from suit based on her communications. Cook County also sought summary judgment on several grounds.

The district court denied defendants' motion for summary judgment in early March 2015. The judge rejected Brown's theories of absolute immunity: that she was protected by an Illinois judicial rule, that her communications were privileged because they were made during a judicial proceeding, and

that her communications were speech related to her official duties. Nor was the judge persuaded that Brown was entitled to qualified immunity on either the retaliation or defamation claims. Brown and the County appealed the district court's decision to deny the motion for summary judgment.

II. *Analysis*

Federal jurisdiction in this case is appropriate: the § 1983 retaliation claim arises under federal law, 28 U.S.C. § 1331, and the defamation claim is part of supplemental jurisdiction, 28 U.S.C. § 1367. Diversity jurisdiction is also available for the state-law claim since plaintiff is a citizen of Wisconsin. See 28 U.S.C. § 1332. We have jurisdiction to consider this interlocutory appeal under the collateral order doctrine. See *Will v. Hallock*, 546 U.S. 345, 349 (2006) (summarizing doctrine); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (denial of qualified immunity based on issue of law); *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (denial of absolute immunity); *Whitlock v. Brueggemann*, 682 F.3d 567, 573 (7th Cir. 2012) (denial of both absolute and qualified immunity from suit).

We review *de novo* a district court's denial of summary judgment on these legal immunity defenses. *Gustafson v. Adkins*, 803 F.3d 883, 890 (7th Cir. 2015). Summary judgment is proper where, construing facts and drawing inferences in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015), quoting *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A. *Absolute Immunity for Defamation*

Brown makes three principal arguments as to why she is absolutely immune from liability against the state-law defamation claims. First, she argues that Illinois Supreme Court Rule 775 shields complainants from liability for complaints filed with the ARDC. Second, she contends that some of the communications are privileged because they were made during the course of a judicial proceeding. Third, Brown argues that her communications are privileged as within the scope of her duties as Clerk of the Circuit Court of Cook County. The district court rejected each of these arguments. We focus our attention on Brown's argument that she is absolutely immune because her statements were related to her official duties. We agree with Brown and reverse on this basis.[1]

1. *Communications Related to Official Duties*

Illinois courts have long held that executive branch officials of state and local governments cannot be civilly liable for statements within the scope of their official duties. *Geick v. Kay*, 603 N.E.2d 121, 127 (Ill. App. 1992). This immunity covers even defamatory statements. *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853, 861 (7th Cir. 1999). The protection cannot be overcome by demonstrating "improper motivation or knowledge of the statement's falsity, including malice." *Id.*; see also *Geick*, 603 N.E.2d at 127. This absolute immunity for such statements "represents a severe restriction" for individuals seeking redress against defamation.

---

[1] Brown also makes an alternative argument that her communications should receive a "qualified privilege" under state law even if they are not shielded by absolute immunity. We need not address her argument for a qualified privilege, which was not presented to the district court.

*Blair v. Walker*, 349 N.E.2d 385, 387 (Ill. 1976). The Supreme Court of Illinois has explained that this immunity is "justified by the countervailing policy that officials of government should be free to exercise their duties without fear of potential civil liability." *Id.*

The privilege "provides a complete immunity from civil action." *Zych v. Tucker*, 844 N.E.2d 1004, 1008 (Ill. App. 2006); see also *Barrow v. Blouin*, 38 F. Supp. 3d 916, 922–23 (N.D. Ill. 2014) (noting that, in Illinois, "an absolute privilege when making statements that are reasonably related to the official's job responsibilities … provides complete immunity from civil action"); Tracy Schachter Zwick, *Overprivileged? A Guide to Illinois Attorney's Privilege to Defame*, 86 Illinois Bar Journal 378, 379 (1998) (officials are protected "not only from civil liability but also from the danger of an unsuccessful civil action"). Brown's immunity defense is therefore properly the subject of an interlocutory appeal from a denial of summary judgment. *Whitlock*, 682 F.3d at 573.

Absolute immunity extends to "executive officials." *Blair*, 349 N.E.2d at 387. *Blair* applied the immunity to the Governor of Illinois. *Geick* held that the immunity also extends to "mayors of Illinois municipalities," "chief administrators," and "official[s] of the executive branch of a local government." 603 N.E.2d at 127. In *Klug*, we predicted the Illinois courts would extend the immunity to local school board officials. 197 F.3d at 861. Citing both the Illinois Supreme Court in *Blair*, 349 N.E.2d at 387, and the Supreme Court of the United States in *Barr v. Matteo*, 360 U.S. 564, 574 (1959), we noted that the privilege was meant to ensure that "officials of government" could be free from unwarranted defamation suits. *Klug*, 197 F.3d at 861.

As Clerk of the Circuit Court of Cook County, Brown's position does not entail the same level of executive authority as a governor or mayor. But the clerk is an elected official who is the chief administrator of a local government office and is charged with a number of executive functions and duties. See 705 Ill. Comp. Stat. 105/13 (2015). Brown is thus immune from liability insofar as she communicated within the scope of those functions and duties.

The scope of the immunity is broad. The sole consideration is "whether the statements made were reasonably related" to the official's duties. *Geick*, 603 N.E.2d at 127–28, citing *Dolatowski v. Life Printing & Publishing Co.*, 554 N.E.2d 692, 695 (Ill. App. 1990). Put another way, officials are immune from suit for "statements made within the scope of their authority." *Horwitz v. Board of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001), quoting *Klug*, 197 F.3d at 861. Depending upon the powers of the office, this scope might broadly include all official duties as well as the "exercises of discretionary judgment" incident to those duties. *Blair*, 349 N.E.2d at 389; see also *Barr v. Matteo*, 360 U.S. at 573–74 ("It is not the title of [an official's] office but the duties with which the particular officer sought to be made to respond in damages is entrusted … which must provide the guide … ."). The immunity is not without limits. While immunity may "protect the functions that particular government officials perform," it does not shield "the government officials themselves." *Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988).

We conclude that all of the arguably defamatory communications in this case are protected by this official immunity. First, Brown's complaint to the ARDC was within the scope of her official duties. Novoselsky's numerous lawsuits against

Brown alleged her dereliction of the office's responsibilities—failure to segregate court fees into separate bank accounts, failure to audit court funds, and unlawful use of court funds for personal gain. Brown's complaint focused on these issues and pointed to the Illinois provisions regulating her conduct in each of these areas. To be sure, Brown tested the boundaries of her immunity by remarking in a footnote that Novoselsky is guilty of "racial animus" and citing controversial publications to show the public has an unconscious perception of African Americans as "intellectually and morally inferior." But taken altogether, the complaint falls within the ambit of Brown's official duties to oversee the Circuit Court Clerk's office and to respond to litigation filed against it.

Brown's press release regarding the ARDC complaint is protected by the immunity as well. *Blair* is particularly instructive and provides a helpful starting point. There, the Governor released a press statement detailing his actions in a tax delinquency case in which two real estate brokers had allegedly taken advantage of distressed homeowners. *Blair*, 349 N.E.2d at 385–86. The Governor admitted that the actions of the two men may have been "technically within the law," but he characterized the brokers as "two bad actors" and "unscrupulous," described their actions as "unconscionable" and "a simple case of greed," charged them of being guilty of "manipulation" and "dishonest dealing," for "[p]reying on a helpless woman." *Id.* at 386.

The Illinois Supreme Court determined that this communication was absolutely privileged. *Id.* at 389. Though the court acknowledged that "press releases can result in great damage to an allegedly defamed individual," it countered that government officials need to be able to inform the public

and their constituents of the issues before their offices. *Id.* at 389. This point echoed the U.S. Supreme Court's similar holding that "a public statement of agency policy in respect to matters of wide public interest and concern is … action in the line of duty" and therefore "within the outer perimeter" of an official's duty for purposes of immunity. *Barr*, 360 U.S. at 574–75 (immunity where acting director of Office of Rent Stabilization issued press release on suspension of two department employees).

Novoselsky argues that *Barr* and *Blair* are inapposite. First, he contends that *Barr* involved the personnel decisions of a supervisor over a supervisee, and that the subject matter of the press releases was therefore far more within the line of duty of the supervisor than is the case with Brown's press release. But there was no such internal personnel decision at issue in *Blair*, and this did not bar the Governor's communications from receiving immunity. *Blair*, 349 N.E.2d at 387, 389. Second, Novoselsky argues that, unlike the defendant officials in *Barr* and *Blair*, Brown did not have supervisory control over the ARDC, so filing a complaint was not within her official duties as clerk.

That is not the proper inquiry. See *Geick*, 603 N.E.2d at 127 (rejecting this framing of *Blair*). If Governor Walker in *Blair* had attempted to stop the actions of the unscrupulous brokers by way of asking the courts for an injunction, over which he had no supervisory control, he could have publicized that step to his constituents without sacrificing his immunity. For purposes of the immunity defense, we ask whether the official had the discretion to "speak out" and to defend "the integrity of the internal operations of the agency which [she] headed,"

not whether she had power over the underlying personnel action described in the press release. *Barr*, 360 U.S. at 574–75.

Novoselsky argues further that the substance of the press release was generally not related to Brown's official duties as clerk. He contends that Brown's allegations concerned "personal, not official matters," including her campaign for Cook County President. The press release's references to Novoselsky's lawsuits against the Circuit Court are at odds with "the true thrust and purpose" of the document, he argues, which was to defame Novoselsky over personal matters. The district court agreed with Novoselsky's conclusion, noting that the communications were of a "personal nature … in relation to elections for which Brown, as an individual, was on the ballot."

Even if the true thrust and purpose of the press release was personal and nefarious, that would not defeat Brown's immunity under Illinois law. In this regard, the absolute privilege is absolute. It is not defeated by malicious intent or improper motivation. *Horwitz*, 260 F.3d at 618, quoting *Klug*, 197 F.3d at 861. An "unworthy purpose" behind the communication "does not destroy the privilege," for immunity would be of little use if it could be defeated by "a jury's speculation as to motives." *Barr*, 360 U.S. at 575, quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). The correct inquiry under Illinois law is whether the action of distributing the press release and the release's contents were related to Brown's duties as clerk. The act of circulating the press release, as noted above, is within Brown's duties. And as in *Blair*, the contents of the release were reasonably related to her duty as clerk and a defense of her and her department's performance. See also *Geick*, 603 N.E.2d at 128 (statement of official discussing alleged political

motivations of action reasonably related to official duties). Accordingly, Brown is entitled to absolute immunity for issuing the ARDC press release.

This case highlights a fundamental asymmetry in Illinois law of absolute immunity. A government official may make defamatory statements, and may even do so with actual malice, about a political opponent so long as the communications pertain to the duties and responsibilities of her office. See Prosser and Keeton on Torts § 114, at 822–23 (5th ed. 1984) (noting that many critics contend this immunity affords "a golden opportunity for utterly unscrupulous politicians to abuse their position by inflicting outrageous injury upon the helpless and innocent"). Yet under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), that political opponent as a member of the public may be liable for defamation if he makes a similar statement about the public official with "actual malice," meaning "with knowledge that it was false or with reckless disregard" for the truth. *Id.* at 279–80. Absolute immunity under state law may therefore produce a form of incumbent advantage on occasion.

But the courts of Illinois have determined that the values of "full public knowledge" and "unfettered discharge of public business" justify such an imbalance. *Blair*, 349 N.E.2d at 387, quoting Comment, *Defamation Immunity for Executive Officers*, 20 U. Chi. L. Rev. 677, 679 (1953); see also *Geick*, 603 N.E.2d at 127. Illinois could also decide to rectify the imbalance by, as a matter of state law, extending the privilege against a defamation suit to all statements criticizing public officials, even those made with malice. But Illinois has not done so, as is its prerogative, and it is our responsibility to apply Illinois law as it currently exists. See *Erie Railroad Co. v.*

*Tompkins*, 304 U.S. 64, 78 (1938); *Bridewell v. Eberle*, 730 F.3d 672, 677 (7th Cir. 2013) ("State courts have the prerogative of innovating on common-law subjects, but federal courts do not.").

For similar reasons, the other communications by Brown are subject to the same privilege. Brown's communications with Reverend Jackson concerned a lawsuit brought against her in her official capacity. The subject of the litigation was Brown's administration of funds pertaining to a juvenile intervention program, a decision within the responsibilities of her office. While Brown made potentially defamatory statements within this correspondence, alleging Novoselsky's litigiousness and racial bias, the communications themselves fall within the broad scope of absolute immunity for statements made in the scope of official duty.

The letter to the BGA was similarly related to Brown's official duties. The correspondence sets out to "serve as a summary of the 23 legal actions" filed by Novoselsky against Brown and her office. Brown noted in the BGA letter that defending the lawsuits has cost her department and the taxpayers in excess of one million dollars. Though her correspondence again veers toward alleging "racial animus" on the part of Novoselsky, Brown's letter concerned her responsibilities and duties as an elected official and tried to rebut charges about the administration of her office.

And, finally, the letter to the Cook County Board of Commissioners was also protected by the absolute immunity under state law. The letter was concerned primarily with an internal investigation by the Office of the Independent Inspector General to determine the source of an internal leak. The

investigation began upon Brown's request for an official investigation of a leak of internal assessments of banks used by the County. This leaked information was important to pending litigation brought by Novoselsky. The County Board letter from Brown discussed Novoselsky by way of background for the broader conversation about the litigation documents. While that discussion of Novoselsky was not flattering, it was largely an aside to a lengthy discussion of Brown's defense of a lawsuit brought by Novoselsky and filing of a formal request with the Inspector General. This set of actions and cooperation with the Cook County Board was reasonably related to Brown's duties as clerk.

### 2. *Alternative Immunity Arguments*

Brown also receives immunity for the ARDC complaint as a statement made during the course of a legal proceeding. Under Illinois law, "anything said or written in the course of a legal proceeding is protected by an absolute privilege." *Zanders v. Jones*, 680 F. Supp. 1236, 1238 (N.D. Ill. 1988) aff'd, 872 F.2d 424 (7th Cir. 1989), citing *Bond v. Pecaut*, 561 F. Supp. 1037, 1038 (N.D. Ill. 1983), aff'd, 734 F.2d 18 (7th Cir. 1984). Otherwise defamatory material is therefore privileged if it arises "during the course and as a part of, a judicial proceeding … if the matter has some relation to the proceeding." *Malevitis v. Friedman*, 753 N.E.2d 404, 406–07 (Ill. App. 2001), quoting Restatement (Second) of Torts § 587 (1977). Statements are privileged even if they are not confined or relevant to the specific issues of the litigation. *Malevitis*, 753 N.E.2d at 407, citing *Popp v. O'Neil*, 730 N.E.2d 506, 510 (Ill. App. 2000), and *Libco Corp. v. Adams*, 426 N.E.2d 1130, 1132 (Ill. App. 1981). They may not,

however, be "inflammatory matters entirely unrelated to the litigation." *Malevitis*, 753 N.E.2d at 407.[2]

In Illinois, the ARDC "sometimes acts as a quasi-judicial body," and "sometimes acts merely as an investigative agency." *Lykowski v. Bergman*, 700 N.E.2d 1064, 1070 (Ill. App. 1998). But the filing of a complaint triggers the judicial role of the ARDC, and "an absolute privilege exists for any statements made during any step preliminary and necessary to a judicial or quasi-judicial proceeding." *Id.* at 1071, citing Prosser and Keeton on Torts § 114, at 819 (5th ed. 1984); see also *Baravati v. Josephthal Lyon & Ross Inc.*, 834 F. Supp. 1023, 1028 (N.D. Ill. 1993) ("Statements made before a quasi-judicial proceeding are absolutely privileged."). The privilege is a complete bar to a defamation claim. *Lykowski*, 700 N.E.2d at 1071. Here, then, Brown cannot be subject to suit for any statements made directly to the ARDC in her filed complaint.

That judicial proceeding immunity extends only to the complaint itself. Statements concerning quasi-judicial proceedings are no longer privileged once given "to third parties such as the media," and therefore the press release would not receive privilege under this theory. *Lykowski*, 700 N.E.2d at

---

[2] The absolute privilege granted to statements made during the course of judicial or quasi-judicial proceedings provides "complete immunity from civil action." *Bushell v. Caterpillar, Inc.*, 683 N.E.2d 1286, 1287 (Ill. App. 1997), citing *Ringier America, Inc. v. Enviro-Technics, Ltd.*, 673 N.E.2d 444, 446 (Ill. App. 1996); cf. *Barrow v. Blouin*, 38 F. Supp. 3d 916, 922–23 (N.D. Ill. 2014) (noting, in the context of statements reasonably related to an official's job responsibilities, that absolute privilege provides complete immunity from suit). An order denying absolute immunity may be reviewed on interlocutory appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). We therefore have jurisdiction to consider this theory.

1071, citing Prosser § 114, at 819–20 ("[S]tatements given to the newspapers concerning the case are not part of the judicial proceeding, and are not absolutely privileged.").[3]

B. *Qualified Immunity on First Amendment Claim*

We turn next to Brown's qualified immunity defense to Novoselsky's § 1983 First Amendment retaliation claim. Qualified immunity protects government agents from liability for their actions so long as they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is a two-part inquiry. First, taking the facts in the light most favorable to the plaintiff, we ask whether the defendant violated a constitutional right. Second, we ask whether that constitutional right was clearly established at the time of the violation. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We have discretion to address these questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[3] Novoselsky also asserts that Brown's communications with his then-client, Reverend Jackson, violated her duties as an attorney under Rule of Professional Conduct 4.2, which prohibits a lawyer, even one who is herself a party to a lawsuit, from communicating directly with an opposing party known to be represented by a lawyer in the matter. See *In re Segall*, 509 N.E.2d 988 (Ill. 1987) (imposing suspension). When the lawyer is a public official, such restrictions on communicating with members of the public can pose difficult problems, as comments to the rule acknowledge. We need not decide in this appeal whether Brown violated Rule 4.2. That is a matter for the Illinois disciplinary authorities; a violation would not give rise in and of itself to a civil claim for damages. See Ill. Rules of Prof'l Conduct, Preamble [20] (2010).

Novoselsky claims that Brown violated his First Amendment rights by retaliating against him for his exercise of those rights. As a general rule, to prevail on the retaliation claim, Novoselsky must demonstrate that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (internal quotation marks omitted), quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); see also *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (applying retaliation framework to state agency's response to litigious party).

Novoselsky's retaliation claim raises two questions for us. First, is Novoselsky's work as a lawyer in and of itself activity protected by his personal rights under the First Amendment? Second, were Brown's statements the rare instance where speech can amount to unconstitutional retaliation?

We turn first to the question of protected activity. Novoselsky argues he was exercising his own First Amendment rights "to petition the government for redress of grievances" and, acting as an attorney, "to bring an action on behalf of [plaintiffs] to seek redress of grievances affecting the public interest."

The First Amendment right to petition the government "extends to the courts in general and applies to litigation in particular." *Woodruff*, 542 F.3d at 551, citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), and *NAACP v. Button*, 371 U.S. 415, 429–30 (1963). This is so at least in part because litigation may be a form of political expression essential for vindicating the interests of minority

groups. *NAACP*, 371 U.S. at 429–30. In *Woodruff*, we held that the party to lawsuits challenging a government entity has a protected right in that litigation activity. *Woodruff*, 542 F.3d at 551. This right can extend to an association of parties seeking to express a grievance through litigation. *California Motor Transport*, 404 U.S. at 510–11. And as the Supreme Court famously declared, the First Amendment protects the right of an organization's "members and lawyers to associate for the purpose of assisting persons who seek legal redress." *NAACP*, 371 U.S. at 428–30.

Accordingly, the right to petition the government is broad when litigation is used as the vehicle. But nothing in these cases settles whether an attorney herself has a personal constitutional right to file lawsuits on behalf of her client. The right to petition protected in *Woodruff* was the right of the party to the litigation, not his counsel. And Novoselsky is not alleging that he has associated with other parties or his client to exercise a First Amendment right.

It appears that only one circuit court has directly decided whether an attorney can claim First Amendment protection on his own behalf in representing his client, particularly for purposes of a retaliation suit. In *Mezibov v. Allen*, 411 F.3d 712, 720–21 (6th Cir. 2005), a divided Sixth Circuit panel ruled that an attorney had no personal First Amendment right at stake when representing his client in a lawsuit. The panel majority noted that judicial proceedings necessarily require a curtailing of free speech by way of various rules of procedure and evidence. *Id.* at 717, citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071 (1991). The panel reasoned that any act by a lawyer is advocacy for his client. Any First Amendment right at issue therefore belongs to the client, and the "sole raison

d'etre" of a lawyer is to vindicate the client's rights and interests, not his own. *Id.* at 720 (distinguishing *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)). Lawyering is not "free expression." *Id.* When a lawyer litigates, the court wrote, he is "simply doing his job." *Id.*

Judge Moore dissented on this point. Restrictions on the First Amendment rights of an attorney do not mean a lack of First Amendment rights altogether. *Id.* at 723 (Moore, J., dissenting in part), citing *Gentile*, 501 U.S. at 1081–82 (O'Connor, J., concurring) (noting that restricting a lawyer's speech in litigation "does not mean, of course, that lawyers forfeit their First Amendment rights"). Nor is it the case that attorneys are "mere conduits for the speech of their clients," as the very "act of agreeing to represent a client in the first instance reflects a decision by the attorney to exercise his or her First Amendment rights on behalf of the client." *Id.* at 724 n.3, citing *Sacher v. United States*, 343 U.S. 1, 9 (1952) ("Of course, it is the right of counsel for every litigant to press his claim … .").[4]

Our court has not yet taken sides in this debate, and we do not need to do so in this case. Novoselsky simply cannot establish that Brown's alleged retaliation constituted a deprivation of his constitutional rights. In this case, the core of the

---

[4] *Mezibov* remains the law of the Sixth Circuit but has been applied reluctantly in subsequent cases. *Bright v. Gallia County*, 753 F.3d 639, 654–55 (6th Cir. 2014) ("*Mezibov* is binding precedent in this circuit … . Therefore, with great reluctance, we hold that, at this time, *Mezibov* prevents us from recognizing [an attorney's] filing of his motion or its contents as protected conduct."); see also *Lewter v. Kannensohn*, 159 F. App'x 641, 648 (6th Cir. 2005) (mem.) (Keith, J., concurring in judgment but dissenting in part) ("I strongly disagree with the majority opinion's reliance on *Mezibov* and its holding … .").

"alleged retaliatory action is in itself speech," namely Brown's written communications. See *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011). Retaliatory speech is generally actionable only in situations of "threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action w[ill] immediately follow." *Id.* at 956–57. In certain cases, a public official may also face liability where he retaliated by subjecting an individual to "embarrassment, humiliation, and emotional distress." *Id.* at 957, quoting *Bloch v. Ribar*, 156 F.3d 673, 679–80 (6th Cir. 1998). But this is a high bar, usually limited to the release of "highly personal and extremely humiliating details" to the public. *Hutchins*, 661 F.3d at 957, quoting *Bloch*, 156 F.3d at 676 (county sheriff responded to rape victim's public criticism by holding a public press conference where he released intimate, humiliating, undisclosed details of the rape).

Short of that boundary, the First Amendment gives wide berth for vigorous debate, and especially for statements by public officials. As the Second Circuit has explained, such officials may express critical views of members of the public even when those views are false. *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999). In *X-Men*, legislators publicly accused a private security guard firm of being part of a hate group, practicing "racism, gender discrimination, anti-semitism, and other religious discrimination," and ridiculing objective findings to the contrary. *Id.* But their statements fell short of "any semblance of threat, coercion, or intimidation." *Id.* Accordingly, the defendant officials were granted qualified immunity against a § 1983 suit. *Id.* at 60.

The D.C. Circuit reached a similar result in *Penthouse International, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991). There, the U.S. Attorney General sent letters to retailers selling a

magazine asking for a response to the accusation that they were involved in the distribution of pornography. *Id.* at 1013. As a result, a retailer discontinued its sales of the magazine. *Id.* The D.C. Circuit held that the Attorney General had not violated the publisher's First Amendment rights: "As part of the duties of their office, … officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate." *Id.* at 1015. A public official must be allowed, on occasion, to criticize a private citizen's speech, writings, or other expressive activity and may do so broadly when no threat of sanction is involved. *Id.* at 1016.

Unconstitutional retaliation by a public official requires more than criticism or even condemnation. However impolitic defendant Brown's statements may have been, they did not rise to the level of threat, coercion, intimidation, or profound humiliation. Even taking all facts in the light most favorable to Novoselsky, he cannot show that he suffered a deprivation of a First Amendment right. Without this, he cannot make a claim for retaliation even if we assume that his work as a lawyer was First Amendment activity. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). And without a cognizable claim for retaliation, Novoselsky cannot demonstrate a violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Brown is therefore entitled to summary judgments both on the merits and based on qualified immunity on plaintiff's First Amendment retaliation claim.

C. *Novoselsky's Claim Against Cook County*

The defendants also raise a number of arguments why summary judgment should be granted on Novoselsky's claim against Cook County. That claim seeks to hold the county responsible for Brown's alleged First Amendment violation on the theory of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a county may be liable for the deprivation of an individual's constitutional right if the "deprivation was the result of the county's official policy, custom, or practice." *Wilson v. Giesen*, 956 F.2d 738, 744 (7th Cir. 1992), citing *Monell*, 436 U.S. 658. To have a viable *Monell* claim for damages, a plaintiff must show a violation of his constitutional rights by an individual defendant. *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015). Because we hold that Brown did not violate Novoselsky's First Amendment right, it follows that Novoselsky cannot avoid summary judgment on his *Monell* claim against the county.

Moreover, under *Monell*, a county may not be vicariously liable for the actions of an unrelated government entity. See *Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989) (in case against Cook County, no liability for actions of employees of elected Cook County Sheriff where county had no authority to train employees or set employee policies). Illinois courts have stated that the position of Circuit Court Clerk is not an officer of the county. *Drury v. County of McLean*, 433 N.E.2d 666, 669 (Ill. 1982) (In Illinois, "the clerks of the circuit courts in this State are not county officials, but are nonjudicial members of the judicial branch of State government.").

There is a jurisdictional complication here, in that a *Monell* defense is a "mere defense to liability," not immunity from

suit, so that a ruling denying a *Monell* defense is therefore not on its own an appealable collateral order. *Swint v. Chambers County Comm'n*, 514 U.S. 35, 43 (1995). We have explained, though, why we have jurisdiction to review Brown's immunity. Our answer to the question of her qualified immunity defeats any basis for a *Monell* claim, so the claim against the county is "inextricably intertwined" with the case against Brown and our review on appeal is proper. See *id.* at 50–51; see also *Abelesz v. OTP Bank*, 692 F.3d 638, 647 (7th Cir. 2012) (pendent appellate jurisdiction is narrow but may be used where there are "compelling reasons for not deferring the appeal of the otherwise unappealable interlocutory order") (quotation marks omitted).

The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment for defendants.